**Appeal of WILLIAM MORRIS ENTER-        Docket No. 808.
PRISES, INC.**

Upon the evidence, held, that the taxpayer is not entitled to classification as a personal service corporation.

Taxpayer's claim for special assessment under section 328 of the Revenue Act of 1918, on the ground of abnormality within the provisions of section 327, denied in the absence of any evidence of abnormality.

Submitted January 26, 1925; decided April 6, 1925.

*Meyer Kurz, Esq.*, and *Michael Kurz, Esq.*, for the taxpayer.
*J. A. Adams, Esq.*, for the Commissioner.

Before IVINS and MARQUETTE.

### FINDINGS OF FACT.

The taxpayer is a New York corporation. It was incorporated in May 1919 for the purpose of securing limited liability to the enterprise of William Morris in conducting a theatrical tour of Sir Harry Lauder in the United States and Canada. The only business it engaged in was the management of that tour. The stock, consisting of 50 shares of a par value of $100 each, was held, 40 per cent by William Morris, 20 per cent by his wife, Emma Morris, and 40 per cent by his son, William Morris, jr. These three constituted the board of directors of the corporation.

William Morris, a theatrical agent and producer, met Harry Lauder in London about 1907 and brought him to America where he booked him in vaudeville as a twenty-minute act. Later he brought him to America again and put him on tour as an individual star. From then to the present time he has managed, individually or through one corporation or another, every theatrical tour of Lauder in the United States or Canada. They became very friendly and arrived at an understanding that Morris should manage all of Lauder's tours in this country, and should personally accompany him on such tours. This understanding was not reduced to a definite contract in writing. Their arrangements were made by letter or cable fixing the time Lauder expected to arrive and how long a tour he desired to make, but saying nothing about compensation or sharing of profits. The sole communication with respect to the 1919–1920 tour was a letter dated Detroit, Mich., January 31, 1919, as follows:

Mr. WILLIAM MORRIS,
    *1493 Broadway, New York.*

MY DEAR WILL: It has been decided that I return again via the United States of America enroute for home returning to this country again early in November, 1919, and I ought to be able to commence a tour with you on or about November 10, 1919. Our conditions will just be as heretofore, and I should be able to extend it to say, about the middle of March. This I presume will be acceptable, in the usual way.

    Sincerely yours,

                          HARRY LAUDER.

The first meetings of the incorporators and the directors of the taxpayer were held on May 16, 1919, at which a proposal from Morris was presented, offering to assign to the taxpayer—

all of his rights in and to a certain agreement made between MR. HARRY LAUDER, of Scotland, and MR. WILLIAM MORRIS, SR., of New York City, for the tour of MR. HARRY LAUDER in the United States and Canada, during the season of 1919–1920, with a company of players, and in connection with which MR. HARRY LAUDER was to be starred and featured similarly to the tours made by him in previous seasons, subject to the performance by this Corporation of all of the terms and conditions of said agreement and the payment to said MR. HARRY LAUDER of his compensation * * *.

in consideration of the delivery by the taxpayer to Morris and his assigns of forty shares of its stock and of a sum equal to ninety per cent of the net receipts realized by the taxpayer from the management and operation of such tour, Morris to be the sole manager and

director of the tour, etc. This proposal was accepted by the incorporators and by the directors, minutes being duly made.

The balance of the capital stock (10 shares) was issued for $1,000 cash.

There is no evidence that Morris ever assigned any part of his right to the 90 per cent of profits indicated above to anybody else.

The minute book of the taxpayer indicates one other meeting of the directors, for the purpose of opening a bank account. Other than these two meetings, no meeting of the directors was ever recorded.

No resolution of the directors was ever adopted declaring any dividend, but the profits of the taxpayer were drawn out by the stockholders, as they needed money, in proportion to their respective holdings.

The business of the taxpayer was conducted in the following manner:

Morris and his son, directly or through the agency of a theatrical bureau (in which the three Morrises were partners) arranged with the operators of theatres in different parts of the country for the production of a show consisting of Lauder's act (an hour and twenty minutes) and four or five short vaudeville acts, on a percentage basis, the taxpayer to take 70 to 80 per cent of the net receipts and the theatre 20 to 30 per cent. The taxpayer paid the transportation expenses of the actors and their baggage and properties, paid the actors' salaries (about $1,000 a week), the hotel expenses of the Morrises, the salary and expenses of a manager and a few employees, advance advertising, etc., and paid Lauder the first $3,500 per week of the net receipts after meeting these other expenses. The balance of the net receipts went into the treasury of the taxpayer and were drawn out by the stockholders. Morris devoted almost his entire time during the tour to the business of managing the tour, leaving the show only for a few short trips to New York. William Morris, jr., joined the show whenever Morris left it, but spent the rest of his time in New York, where he attended to matters for the show, such as changes in booking, but devoted most of his time to other business. Mrs. Morris accompanied the show as a companion to Mrs. Lauder and assisted her in entertaining at "Scotch teas" and other receptions and parties which were planned for increasing the popularity of the star and of his performances.

Only a nominal outlay for advertising was necessary to get the tour under way, the advance sale of tickets producing sufficient money for current expenses. After the tour began, the receipts were always sufficient to pay all expenses, including Lauder's salary or share of the profits, and to produce a surplus. The contracts with the actors, other than Lauder, were subject to suspension in case of Lauder's failure to appear, and to cancellation upon two weeks' notice. There was no agreement with Lauder to continue the tour if it should fail to come up to expectations, nor to pay him except to the extent of $3,500 per week of such profits as might be earned. The understanding that Lauder should receive $3,500 per week, if earned, was not in writing, and was subject to readjustment as the parties might see fit.

The taxpayer filed income-tax returns for 1919 and 1920 on form 1065, claiming to be a personal service corporation. The 1919 return showed:

| | |
|---|---:|
| Gross income | $141,276.82 |
| Ordinary and necessary expenses | 102,745.63 |
| Net income | 38,531.19 |

Members' shares of income:

| | |
|---|---:|
| William Morris 40 per cent | $15,412.47 |
| William Morris, jr. 40 per cent | 15,412.47 |
| E. Morris 20 per cent | 7,706.25 |
| | 38,531.19 |

The 1920 return showed:

| | |
|---|---:|
| Gross income | $166,768.25 |
| Ordinary and necessary expenses | 92,914.36 |
| Net income | 73,853.89 |

Members' shares of income:

| | |
|---|---:|
| William Morris 40 per cent | $29,541.56 |
| William Morris, jr. 40 per cent | 29,541.56 |
| E. Morris 20 per cent | 14,770.77 |
| | $73,853.89 |

The item for ordinary and necessary expenses included, in each year: railroad fares, salaries (in which were included the payments to Lauder), printing, agent's expense, general expense, transfer, extra advertising, carpenter's account, props, telegrams and postage, express, calciums, office expense, manager's expense, secretary's expense, auto hire, hotels and rentals.

A revenue agent examined the taxpayer's books and recommended an addition to 1919 net income of $2,160.26 on account of deductions taken in that year, applicable to 1920, but did not adjust 1920 income accordingly. The Commissioner accepted the figures given in the revenue agent's report, but refused to allow the taxpayer a classification as a personal service corporation, and computed the tax under the provisions of section 302 of the Revenue Act of 1918, finding deficiencies in tax as follows:

| | |
|---|---:|
| 1919 | $14,378.07 |
| 1920 | 29,632.79 |
| Total | $44,010.86 |

From his determination the taxpayer brought this appeal.

### DECISION.

The deficiencies should be recomputed in accordance with the following opinion. Final determination will be settled on ten days' notice in accordance with Rule 50.

### OPINION.

Ivins: The taxpayer makes a preliminary point that its net income for 1920 should be reduced by $2,160.26, the amount disallowed as a 1919 deduction, on the ground that it belonged in 1920, but not

added to 1920 deductions. It is correct in this, and the tax for 1920 should be recomputed accordingly.

The taxpayer makes four other contentions:

(1) That it is a personal service corporation within the definition in section 200 of the Revenue Act of 1918, and entitled to be taxed as such.

(2) That it is entitled to a deduction for depreciation on the "contract" for which it issued $4,000 of stock.

(3) That, if not entitled to personal service classification, it should be allowed as a deduction in each year a sum amounting to 90 per cent of its profits which it obligated itself to pay for the "contract."

(4) That, if not classified as a personal service corporation, it is entitled to special assessment under the provisions of sections 327 and 328 of the Revenue Act of 1918.

We shall discuss these contentions in the order indicated.

(1) Was the taxpayer a personal service corporation? In order to come within the definition in section 200 of the Revenue Act of 1918, it must satisfy three requirements—the income must be primarily attributable to the activities of the principal stockholders; the principal stockholders must be regularly engaged in the active conduct of its business; and capital must not be a material income-producing factor. *Appeal of Bryant & Stratton Commercial School, Inc.*, 1 B. T. A. 32. If it fails to meet any one of these tests, it is not entitled to classification as a personal service corporation. Let us apply the first test. What was the source to which the taxpayer's income was primarily attributable? What did the public pay its money for? It was not to see the latest production staged by William Morris, but to hear the inimitable Harry. There is no doubt that Morris' showmanship and salesmanship greatly enhanced the success of the enterprise, and Mrs. Morris' " Scotch teas " probably helped, too. But it was the Lauder act, not the Morris production, that really drew the crowds.

The purpose of the statute was to grant a privilege to certain corporations whose activities consisted of the rendition of personal services, by its stockholders, for money. Presumably the services were to be rendered to those who paid the money. Counsel took the position that Lauder employed the taxpayer to render services to him—that he retained, through it, the professional services of the Morrises—rather than that the taxpayer hired him to act in its show. But we can find nothing in the evidence to justify such a conclusion. The arrangement did not differ from that between Barnum and the white whale except in that Lauder was to be paid a part of the profits if any were earned. If the show had been a failure, Lauder would have lost his time, but the taxpayer would have lost the money it had to pay out for advertising, traveling expenses, salaries of vaudeville actors, manager, etc. At the utmost, it was a joint venture between Lauder and the taxpayer, not an employment of the taxpayer by Lauder. Lauder was under no obligation to pay the taxpayer anything in any circumstances.

If services were rendered to anybody they were rendered to the paying public. And for whose services did the public pay? When

a client goes to a lawyer, a doctor, or an engineer, he retains his services. It may be that a large part of the work done under the retainer will be performed by a clerk, a nurse, or a draftsman in the employ of the professional man, but it is *his* ability, skill, or judgment that is desired, whether exercised directly or by way of supervision. It is *his* reputation that attracts patrons. It is *he* who will be held responsible for the quality of the services rendered. In the case before us it was the other way. If Lauder's voice had failed, the taxpayer could not have hired a substitute, as the professional man could readily get a new clerk, nurse or draftsman. Lauder could easily find more managers—perhaps not so clever, but with sufficient ability to make his act a paying proposition. But where could Morris find another Lauder?

We are satisfied that, while the ability of William Morris undoubtedly contributed to increased receipts, the profits of the taxpayer were principally attributable not to his activities, but to Lauder, the reputation of Lauder, the activities of Lauder (who was not a stockholder in the taxpayer corporation), or possibly to the "contract," if one can call it such, or the friendship between Morris and Lauder.

It is not necessary to go into the question of whether the "contract" or friendship was capital—it certainly was not a personal activity of the Morrises, and it (or Lauder's activities) certainly constituted the principal source of the taxpayer's revenue. The taxpayer, having failed to meet the first test provided in the definition, must be denied classification as a personal service corporation.

(2) Should the taxpayer be allowed a deduction for "depreciation" of its contract with Lauder? We are not at all sure there was a contract. The letter quoted in the findings could hardly have constituted the basis for an action had Lauder decided not to go on tour, or for an injunction if he had decided to take another manager. Morris did testify that Lauder had once told him, sixteen or seventeen years ago, that he would never let anybody else manage him in America, but that statement was hardly an assignable asset. Morris' testimony also rather negatived his counsel's contention that "We will prove that it was a contract for a definite period, for a definite life. We will prove its value and use that in support of the deduction." It was, in part, as follows:

Q. Did you enter into a contract with Lauder on or about May, 1919, to tour him in this country?

A. Well, when you say a contract, we have really never had a contract. He would either cable me or write a letter and sometimes a postal card.

Q. Will you tell the Board what your custom was with respect to a contract with Lauder?

A. Yes. Why, he would write me, or cable me, or state "Will, I will open with you on such and such a day, and I think I can play so many weeks. You better go ahead and route the tour," or something of the kind.

Q. That would be all?

A. That is about all.

Q. Either his letter or cable stated the terms upon which he employed you?

A. I don't just remember. I don't think so. I think he would usually say, "I can open" or "get ready to book the tour," commencing at such and such a day, "terms and conditions same as before." I think that is the way we did business right along. There may have been an original contract 16 or 17 years ago.

Q. Did you ever consider it necessary to ask for a written contract?
A. No.
Q. For your protection?
A. No.
Q. Lauder never asked you for a written contract?
A. No.

And we have no evidence of the value of the alleged " contract " that was assigned to the taxpayer. Morris did say when asked what, in his opinion, it was worth: " Well, the profit of it, whatever that might be." This hardly constitutes a definite enough basis for the setting up and writing off of an asset on the books of a corporation. The taxpayer issued $4,000 of stock for this " contract," but there is no evidence of the value of that stock. The fact that $1,000 was paid for the other ten shares of stock indicates nothing, for it was paid by the same interests that turned in the " contract " and held all the stock—it was not an arm's length transaction nor a transaction in open market. Morris put in the " contract " and the money for all the stock of a corporation he was himself creating. We can find no basis for allowing any depreciation on this " contract."

(3) Should the taxpayer be permitted a deduction amounting to 90 per cent of its profits, on the theory that it paid this much (in addition to 40 shares of stock) for the right to operate under the contract? It does not appear that it ever paid any part of such consideration. The profits of the corporation were all divided ratably among its stockholders. There is no evidence that Morris ever assigned any interest in his right to receive 90 per cent of the profits to his wife or son. What they received was by way of dividends, attributable to their stockholdings. There is no evidence that Morris waived his right to proportionate distribution, so presumably what he took was also by way of dividends—the exact ratable distribution indicates as much. The corporation kept no minutes (except of the first meetings and one bank resolution), but the stockholders certainly were in a position, by unanimous consent coupled with acquiescence on the part of Morris, to abrogate that part of the taxpayer's agreement that called for a payment to Morris of 90 per cent of the profits, and to distribute the entire profits as dividends, and this is apparently what they did. The fact that they might not have done so, had they known the taxpayer would be refused personal service classification, can not constitute a basis for allowing a deduction for a payment never made.

(4) Is the taxpayer entitled to special assessment under the provisions of sections 327 and 328 of the Revenue Act of 1918? It contends that the computation of its tax under section 302 will work excessive hardship as compared with taxes imposed on representative corporations in similar businesses. But it has adduced no evidence of any abnormality of invested capital or income, for the purpose of testing its right under section 327. Its claim must be rejected.